UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| LYDIA GAINES | CIVIL ACTION NO. 08-CV-0366 |
|---|---|
| VS. | JUDGE MELANÇON |
| MICHAEL J. ASTRUE<br>COMMISSIONER<br>SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **AFFIRMED**.

*Background*

Gaines is 56 years old and has one year of college. She has worked in the past as a food server and food server supervisor. Gaines seeks disability insurance benefits, alleging disability since February 17, 2000 due to obesity, back and neck pain, bilateral carpal tunnel syndrome, and major depression. Gaines' application was denied on initial review and, following an administrative hearing, the ALJ denied benefits on August 29, 2002. The Appeals Council denied review and Gaines appealed. The district court reversed and remanded the Commissioner's decision to deny Gaines benefits.

A second hearing was held on July 19, 2005. On October 7, 2005, the ALJ again denied benefits. The appeals council denied Gaines' request for review on February 2, 2008 and Gaines timely filed the instant appeal.

## *Issue Presented*

The central issue presented is whether there is substantial evidence in the record to support the ALJ's finding that there is work in the national and state economy that Gaines can perform.

## *Standard of Review and Procedure for Analysis of Impairments*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).[1] In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992).[2]

---

[1] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

[2] The procedure is as follows:

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

The standard for mental disability claims is applicable here, as Gaines alleges she suffers from affective and depressive disorders, bipolar syndrome, panic attacks, and trauma-related anxiety. When a mental disability claim is made, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[3]

Here, the ALJ determined that Gaines' obesity, status post-lumbar surgery, bilateral carpal tunnel syndrome, status post-cervical surgery, and major depression are severe impairments.[4] He then concluded that Gaines has the residual functional capacity to perform a significant range of sedentary work.[5] Relying on the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers which Gaines can perform, and therefore she is not disabled.[6]

---

[3] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004).

[4] Tr. 368.

[5] Id.

[6] Id.

## *Medical Evidence*

On April 17, 1994, Gaines slipped and fell at work and injured her back and neck. (Tr. 230). Gaines' last date insured is June 30, 2001. Much of the evidence considered by the ALJ was for surgeries and medical events in 2003 and 2004. Because the ALJ considered this evidence in his findings, it will be considered by the undersigned.

**Administrative Hearing**

Gaines testified that she has cervical, lumbar and knees problems, is in chronic pain and has a lot of mental stress; she can hardly use her hands and her arm swells if she tries to do dishes.[7] She has a pain level of 7 or 8 most of the time.[8] Gaines is depressed, has problems with her memory, does not like to be in crowds, has trouble sleeping, and needs to have somebody with her all of the time because she falls a lot.[9] Gaines' daughter drives her to Houston to stay with her.[10] Gaines goes to visit her grandchildren and they go to her house to visit.[11] She attends church twice a month but cannot go every Sunday because her back hurts.

Gaines' daughter, Kimberly Jack, testified that the Plaintiff "constantly complains that she's in pain."[12] Gaines' friend, Sally Huntsberry, testified that the Gaines is stressed and cries all the time, and if they go for a walk, "lots of times" Gaines will fall.[13]

---

[7] Tr. 583.

[8] Tr. 584.

[9] Tr. 596-600.

[10] Tr. 601-602.

[11] Tr. 602.

[12] Tr. 607.

[13] Tr. 608.

**Physical**

On December 5, 1996, upon request for an Independent Medical Evaluation by Louisiana Worker's Compensation Program, Dr. Clark Gunderson examined Gaines. She complained of back, neck, and joint pain in the knees, hips, and ankles, as well as daily headaches. (Tr. 230, 231). Dr. Gunderson reviewed the results of her February 20, 1995 myelogram which showed Gaines had minimal anterior defect at C5-6. He concluded that an electromyography done on July 23, 1996 showed minimal denervations at C6 bilaterally and on L4 on left side and evidence of right carpal tunnel syndrome.

Dr. Gunderson's impression was that her complaints involving her entire body were more arthralgic than related to her compressive radiculopathy. He did not recommend surgery but instead a short program of pain management and physical therapy and subsequent Functional Capacity Evaluation.

On July 27, 1995, Dr. Dean Moore, M.D., opined that Gaines had a herniated cervical disk at the C5-6 level bilaterally that was clearly defined on the myelogram. (Rec. Doc. 224). He believed
that Gaines had multi-level lumbar spinal stenosis.

On April 2, 1998, a CT scan showed a herniation of the L3-4 intervertebral disc. Tr. 318). On June 30, 1998, Dr. Robert D. Bernauer, M.D. performed an anterior cervical diskectomy and fusion C5-6 and C6-7. (Tr. 305).

A CT scan on April 25, 2000 showed a broad base disc protrusion on the left at L3/4. (Tr. 63). Dr. Bernauer performed a lumbar laminectomy and diskectomy at L3-4 on July 20, 2000. (Tr. 66).

On July 26, 2001, Dr. Bernauer performed a right carpal tunnel release. (Tr. 69).

On December 27, 2001, Fayez Shamieh, M.D. performed an electromyography which showed evidence of bilateral carpal tunnel syndrome. (Tr. 75). The results showed minimal electromyographic changes along C6 and C7 bilaterally considered to be borderline abnormal and possibly secondary to her previous laminectomies.

Gaines is 5'8" tall, and has weighed up to 324 lbs. (Tr. 88, 234, 283, 333, 450, 453). Dr. Bernauer described her as "grossly obese." (Tr. 401).

On August 8, 2002, Dr. Christopher Lew, M.D., noted that Gaines had continued with back and leg pain after her surgery. (Tr. 370). Dr. Lew administered a lumbosacral epidural steroid injection. He prescribed Paxil, Lorcet Plus, Zanaflex and Xanax. (Tr. 370).

MRI results on June 11, 2002 showed post surgical changes with her fusion of C5, C6, and C7; mild disc bulging and left neural canal narrowing at C4-4; suspected osteophyte at C5-6 causing cord impingement; neural canal narrowing bilaterally; and broad based disc bulging and central canal and bilateral neural canal stenosis.[14] There were postoperative changes at L3-4 with some disc bulging; disc bulging and central canal stenosis at L4-5; and disc bulging with suggestion of small disc protrusion at L5-S1 with left neural canal, some central canal narrowing and bilateral lateral recess narrowing.[15]

Dr. Bernauer saw Gaines on October 21, 2002 for back and bilateral leg pain. He noted her history of 3 bad discs, referred her for weight loss surgery so she could have back surgery, and prescribed Lorcet Plus and Naprosyn.[16]

---

[14] Tr. 84, 85.

[15] Tr. 86.

[16] Tr. 400.

Drs. Bernauer and Flood treated Gaines from June 2003 to October 2004 for back, neck and knee pain.[17]

Dr. Gunderson examined Gaines twice in 2003.[18] Dr. Gunderson concluded in May 2003 that her motor sensory and reflex in the upper extremities were normal but that the range of motion in her neck was 75% of normal. Gaines undressed and dressed without difficulty; her posture and gait were normal; she had normal strength in her lower extremities. Her straight leg test was inconsistent in that her sitting position was positive at 90 degrees and her supine position was positive at 20 degrees.[19] Dr. Gunderson recommended intensive pain management and believed that she could possibly benefit from gastric bypass surgery but not from any other surgery.[20]

On December 11, 2003, Gaines reported she had been an a car accident and gone to the Lake Charles Memorial Hospital Emergency Room. She was advised to see an orthopaedic surgeon. Gaines subsequently went to see Dr. Gunderson for treatment. Dr. Gunderson noted that x-rays of her cervical spine demonstrated a solid interbody fusion at C5-6 and C6-7. X-rays of the lumbar spine showed minimal degenerative changes at multiple levels with fairly good preservation of the disc spaces.[21] Dr. Gunderson concluded that Gaines had a cervical/lumbar type injury, superimposed on a previously operated cervical/lumbar spine. He recommended an MRI, referred her for physical therapy and prescribed pain medication, a muscle relaxant and an anti-inflammatory agent.

---

[17] Tr. Tr. 489-503.

[18] Tr. 383-387.

[19] Tr. 384.

[20] Tr. 387.

[21] Tr. 387.

On July 28, 2005, Drs. Bernauer and Flood opined that Gaines was totally and permanently disabled from any gainful employment and had not been able to return to work since August 4, 1996. (Tr. 561).

**Mental**

In a psychological evaluation performed on November 9, 1999, Jerry Whiteman, Ph.D., a licensed psychologist, opined that Gaines is of a type that presents herself in a dramatic fashion with a variety of somatic complaints, some of which are stress reactions. (Tr. 88). Dr. Whiteman diagnosed depression associated with chronic pain. (Tr. 89).

Dr. Charles M. Robertson, Psy.D, clinical psychologist, examined Gaines on September 20, 2003.[22] Dr. Robertson found that she had no psychological restrictions that would prevent her from performing light work.[23]

Dr. John M. Boutte treated Gaines in 2003 and 2004. He concluded that Gaines had pain disorder, major depression, and generalized anxiety disorder.[24] On April 28, 2004, he concluded that she met the social security listings for disability based on her mental impairments.[25]

### *Findings and Conclusions*

Gaines' last date of insured was June 30, 2001 so she must show that she was disabled then to be awarded benefits.

---

[22] Rec. Doc. 371-373.

[23] Tr. 373.

[24] Tr. 503-544.

[25] Tr. 397.

The ALJ found that Gaines' obesity, status post lumbar surgery, bilateral carpal tunnel syndrome, status post cervical surgery, and major depression are severe impairments.[26] He concluded that Gaines could perform sedentary work, stating:

> * * * Specifically, the claimant can lift less than ten pounds frequently and ten pounds occasionally. She can stand/walk less than two hours in an eight hour workday. She needs the option to sit/stand at will. She is limited to occasional overhead reaching and occasional pushing/pulling with the upper extremities. She is limited to occasional pedal operation with the lower extremities. She can not balance, kneel, crouch, crawl, or stoop. She can never climb ramps, stairs, ropes, ladders, or scaffolds. She can have only limited contact with the public. She is limited to simple procedures that are routine and repetitive, without frequent changes in duties, and without high or demanding production goals (at a non-assembly-line pace).[27]

**Residual Functional Capacity**

Gaines argues that the ALJ did not properly perform a function by function assessment of her RFC because he did not discuss all of her exertional limitations in accordance with Title 20 C.F.R. §404.1545 and SSR 96-8 and 96-9.

Title 20 C.F.R. §404.1545 and SSR 96-8 each set forth general provisions for determining a claimant's residual functional capacity. The RFC analysis is a function-by-function assessment of all evidence relative to an individual's ability to work on a regular and continuing basis. The RFC involves exertional and nonexertional factors.[28]

---

[26] Tr. 364.

[27] Id.

[28] Exertional capacity addresses: an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull"). Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, 5 (S. S. A. 1996).

SSR 96-P addresses in part the ALJ's procedure for addressing sit/stand limitations:

> **Alternate sitting and standing**: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

Titles II and XVI: Determining Capability to Do Other Work-implications of a Residual Functional Capacity for less than a Full Range of Sedentary Work, 1996 WL 374185, 7 (S. S.A. 1996).

The ALJ did not specifically analyze Gaines' sit/stand limitations. However, the United States Court of Appeals for the Fifth Circuit has held:

> Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected.

Qualls v. Astrue, 2009 WL 2391402, 3 (5th Cir. 2009) *citing* Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988).

Gaines claims that the ALJ erred when he failed to separately address her need to alternate between sitting and standing and that, if he had done so, he would have found that her needs to "alternate between sitting and standing could not be accommodated by 'scheduled breaks and a lunch period.'"[29]

---

[29] Rec. Doc. 14-6.

Here, Gaines' argument is conclusory, and she does not show how she has been prejudiced. While the ALJ may not have addressed Gaines' sit/stand limitation individually, it is clear from his decision that he thoroughly considered the evidence when analyzing her limitations. Moreover, the ALJ did not conclude that her sit/stand limitations could be "accommodated by scheduled breaks and a lunch period" as Gaines states. To the contrary, the ALJ's RFC, as Gaines herself admits, includes the limitation that she must be allowed to sit/stand *at will*. This limitation was included in the hypothetical to the VE.[30] The undersigned thus finds this argument to be without merit and that the ALJ's residual functional capacity was supported by substantial evidence.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). The ultimate issue of disability is reserved to the Commissioner. The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Martinez v. Chater, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). The ALJ's determination in this regard is entitled to considerable deference. Id. However, if uncontroverted medical evidence reveals a basis for the subjective complaints of pain, the "ALJ's unfavorable credibility evaluation of a claimant's complains of pain will not be upheld on judicial review . . . at least where the ALJ does not on an articulated basis weigh the

---

[30] Tr. 613.

objective medical evidence in assigning reasons for discrediting the claimant's subjective complaints of pain." Cook v. Heckler, 750 F.2d at 395.

When considering Gaines' complaints of disabling pain, the ALJ gave little weight to Dr. Bernauer's statement that Gaines could not work:

> The undersigned has carefully considered the statement of Dr. Bernauer dated March 2005, that the claimant is totally and permanently disabled from any work, as the statement dated July 2005, signed by Dr. Bernauer and Dr. Flood. . . .The undersigned has considered the medical opinions of all treating and examining physicians. The overall record does not support the opinions by Dr. Bernauer and Dr. Flood, regarding the claimant's ability to work. The evidence is not supported by sufficient objective medical evidence. The doctors apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept what the claimant reported. The opinions are quite conclusory, providing very little explanations of the evidence relied on in forming that opinion. Additionally, the report is not consistent with the residual functional capacity questionnaire Dr. Bernauer completed in August 2001 . . . which the undersigned gives controlling weight. . . . [T]he ultimate determination of disability is for the Commissioner to decide under the Regulations. Based on these factors, the undersigned gives this physician's opinion little weight.[31]

As the ALJ states, Dr. Bernauer concluded in August 2001 that Gaines had the ability to frequently lift 10 pounds and could sit only for less than 6 hours but was not limited to periodically alternative sitting and standing. During their treatment of Gaines in 2003 and 2004, Drs. Flood and Bernauer did not prescribe any pain medication or other medication for any length of time to treat her back and neck pain.[32] Moreover, on October 5, 2004, Dr. Flood remarked that Gaines was doing well in physical therapy.[33] Considering the foregoing, and after

---

[31] Tr. 364-365.

[32] Dr. Flood noted on May 7, 2004 that Gaines complaints of right knee and right ankle pain were a "brand new problem." These complaints began long after Gaines was last eligible for disability benefits, June 30, 2001, and, thus, will not be considered in determining whether the ALJ's decision is supported by substantial evidence.

[33] Tr. 489.

a review of the record, the undersigned concludes that the ALJ's decision to discount Dr. Bernauer's opinion that Gaines cannot work is supported by the evidence.

Likewise, the ALJ's decision that Gaines' complaints of disabling pain were not fully supported by the record is supported by substantial evidence.[34]

Gaines testified that she could not use her hands most days and she could lift only three to five pounds. Here, the ALJ considered the medical evidence, including Dr. Gunderson's findings on May 8, 2003 that her motor, sensory, and reflex examination in the upper extremities was normal, and she had normal strength in her lower extremities. The ALJ also based his findings on Dr. Gunderson's December 2003 examination showing that her posture and gait were normal and she had normal strength in the lower extremities. The ALJ also relied on the evidence that Gaines did not testify to an inordinate amount of pain medication; her complaints of sleepiness were not documented in any complaints to her doctors; and she had not visited the emergency room frequently nor been admitted to the hospital for any length of time. As to her complaints of limited activity, the ALJ observed that no doctor had limited her activity.

The record shows that the ALJ properly considered Gaines' allegations of pain, analyzed the severity of pain in connection with the medical evidence and testimony, and determined that Gaines' pain was not, in and of itself, disabling. Gaines testified that she does not cook but is able to make a sandwich, she does her laundry, some housework, visits her daughter in Houston, visits her grand-kids either at her home or theirs, and goes to church twice a month. Gaines

---

[34] The Fifth Circuit has held that pain, in and of itself, can be a disabling condition, but only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir.1991). The ALJ has discretion to determine the disabling nature of subjective complaints of pain, "at least where the medical evidence is inconclusive." Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). The ALJ's determination in this regard is entitled to considerable deference. Id.

14

testified that Dr. Bernauer sent her to physical therapy in November 21, 2003. There was no testimony that she otherwise received physical therapy. By October 5, 2004, Dr. Bernauer notes that Gaines was doing well in physical therapy and has lost several inches in her measurements and 20 pounds.[35]

The ALJ also considered Dr. Boutte's statement on April 28, 2004 that Gaines' depression equaled Section 12.04 A1a, c, e, B2, 3.[36] The ALJ found that Dr. Boutte's opinion

---

[35] Tr. 489.

[36] Listing 12.04 provides in pertinent part:

**12.04 Affective Disorders:** Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

  A. Medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        I. Hallucinations, delusions or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractibility; or
        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h. Hallucinations, delusions or paranoid thinking;
  Or
    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
        And
  B. Resulting in at least two of the following:

was not supported by the record because (1) her activities of daily living were only moderately impaired since she was able to do some household chores and was able to see her doctors; (2) her social activities were only marginally impacted because she was able to attend church twice monthly; (3) her concentration, persistence or pace were only moderately affected because Dr. Robertson noted her attention and concentration were intact in 2003; and (4) there was no evidence of de-compensation.

The record shows that Gaines was referred to Dr. Boutte on November 14, 2002.[37] On that date he concluded that Gaines was suffering from major depression and anxiety and pain disorder. He noted on May 15, 2003 that Gaines was moderately depressed.[38] At the same time, he found that Gaines had no suicidal ideation, risk of violence, not psychosis or poor impulse control. Dr. Boutte assessed that she was highly motivated, had good insight, good judgment and was compliant with her treatment.[39] Likewise, on April 29, 2004, Dr. Boutte found that Gaines

---

      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

20 CFR Pt. 404, Subpt. P, App. 1. The Listing provides alternatively:

    C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
        1. Repeated episodes of decompensation, each of extended duration; or
        2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
        3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

[37] Tr. 534.

[38] Tr. 518.

[39] Tr. 519.

continued to have high motivation, good insight and good judgment.[40] Additionally, Dr. Robertson found that she described her pain as unrealistically high, and he believed she could not distinguish between one pain level and another. He also felt that Gaines had made no effort to cope with her pain. Accordingly, the undersigned finds that Dr. Boutte's statement that Gaines is disabled are not supported by nor is it consistent with his own examination findings. The undersigned thus concludes that the ALJ's determination that Gaines' mental impairments are not disabling is supported by substantial evidence of record.

Considering the foregoing, after review of the medical record of evidence and Gaines' and other witness testimony, the undersigned concludes that the ALJ's determination that Gaines can perform sedentary work is supported by the evidence.

**VE Testimony**

The ALJ's RFC determination was that Gaines could perform a limited range of sedentary work, including the limitation that Gaines was limited in her contact with the public. The ALJ's hypothetical to the VE included this limitation. The VE testified that Gaines could work as an order clerk, charge account clerk, or as a surveillance system monitor. Gaines argues that the vocational expert identified jobs for Gaines that conflicted with the ALJ's RFC. Gaines also argues that the DOT, U.S. Dep't of Labor, Dictionary of Occupational Titles, 209.567-014, 205.367-014, 379.367-010 (4th ed., rev. 1991) shows that each of these jobs require contact with the public.

The Fifth Circuit has ruled that a conflict between the vocational expert's testimony and the *Dictionary of Occupational Titles* ("DOT") does not invalidate the expert's testimony:

---

[40] Tr. 506.

> To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT in this case, we agree with the majority of the circuits that the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so. As the facts of this case demonstrate, all kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

Carey v. Apfel, 230 F.3d 131, 146 -147 (5th Cir. 2000). Thus, when a conflict does arise, the claimant should address the conflict at the administrative hearing.

The VE testified that her testimony was consistent with the DOT.[41] However, it appears that the VE's testimony appears to conflict with the DOT listings and the ALJ's RFC analysis, which limits Gaines' interaction with the public.

Gaines, however, did not cross-examine the expert about this issue despite having an opportunity to do so at the hearing. Moreover, it is clear that the VE, which the ALJ noted testified "all the time for cases like this," considered the testimony of record. Further, the ALJ specifically queried the VE several times whether the jobs she was listing were performed as they are generally performed in the economy. The VE clearly understood Gaines' limitations and testified that Gaines could work as a order clerk, charge account clerk, or as a surveillance system monitor as these jobs are *generally performed.*

Gaines also argues that the VE's testimony that she can perform as a order clerk, charge account clerk, or as a surveillance system monitor conflicts with the ALJ's assessment limited Gaines to jobs that had "simple procedures, routine and repetitive, without frequent changes in

---

[41] Tr. 614.

duties."[42] Gaines asserts that the DOT requires that these jobs require the ability to deal with problems involving several concrete variables in or from standardized situations and that she does not have the ability to do so.

Gaines relies on a decision from the Eighth Circuit Court of Appeals, Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) the ALJ had determined that the claimant's sedentary RFC was reduced by his borderline intellectual functioning. Based on the *Medical-Vocational Guidelines*, the ALJ in that case determined there were jobs the claimant could perform. The 8th Circuit reversed because borderline intellectual functioning is a non-exertional impairment that must be considered by a VE and it is error for an ALJ to rely on the Grids in such a situation. Lucy v. 113 at 908. Here, the ALJ relied on expert testimony rather than the Grids. As found before, the VE considered the ALJ's RFC and testified that she could perform the jobs of order clerk, charge account clerk or surveillance system monitor as these jobs are generally performed. The undersigned thus finds this argument also lacks merit.

Considering that Gaines did not cross-examine the VE concerning any purported discrepancies in her testimony, and because the VE clearly understood Gaines' limitations and testified that there is work in the economy that Gaines can perform as the jobs are generally performed, the undersigned concludes that the ALJ did not err in relying on the testimony of the VE in determining that Gaines is not disabled.

## *Conclusion*

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED.** Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties

---

[42] Tr. 613.

aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on September 2, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)